# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-0227V

|  |  |
|---|---|
| CARTER SCHOENBORN,<br><br>       Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>       Respondent. | Chief Special Master Corcoran<br><br>Filed: February 28, 2024 |

*Paul R. Brazil*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Joseph Lewis*, U.S. Department of Justice, Washington, DC, for Respondent.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING TABLE CLAIM**[1]

  On January 7, 2021, Carter Schoenborn filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that on October 1, 2020, an influenza ("flu") vaccine was administered in his right shoulder, and that he consequently suffered a right shoulder injury related to vaccine administration ("SIRVA") as listed on the Vaccine Injury Table. Petition (ECF No. 1). The case was assigned to the Office of Special Masters ("OSM")'s Special Processing Unit ("SPU").

---

[1] Because this ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

As discussed below, Petitioner has furnished preponderant evidence of the alleged right-sided vaccine administration – but *not* that he ever suffered reduced range of motion, as required for a Table SIRVA claim. Petitioner's Table claim must therefore be dismissed, although he will be permitted to pursue an "off-Table" claim based on the same facts.

## I.  Relevant Procedural History

As noted above, Petitioner initiated the claim in early 2021. He subsequently confirmed that his medical treatment course had concluded, and he conveyed a demand for pain and suffering, plus out-of-pocket expenses, for Respondent's consideration. Status Report filed July 28, 2022 (ECF No. 27). Respondent entered into settlement discussions. Status Report filed Oct. 3, 2022 (ECF No. 29). However, the parties could not informally resolve the case. Status Report filed Jan. 18, 2023 (ECF No. 34).

Accordingly, Respondent formally presented his opposition to compensation for a Table SIRVA, because he disputed 1) the alleged vaccine administration site, and 2) that Petitioner suffered limited range of motion. Rule 4(c) Report filed Mar. 20, 2023 (ECF No. 36). The parties subsequently received my preliminary reaction to those issues, were again encouraged to pursue informal resolution, and given a schedule for filing any additional evidence and briefing. Scheduling Order filed June 29, 2023 (ECF No. 38) (memorializing a telephonic status conference held the previous day). The parties did not change their positions however, and they briefed the Table SIRVA claim. Petitioner's Memorandum filed Aug. 14, 2023 (ECF No. 39) (hereinafter "Brief"); Respondent's Response filed Oct. 5, 2023 (ECF No. 41).[3] Petitioner did not avail himself of the opportunity to file a Reply by the specified deadline of October 20, 2023, or seek any modification of the schedule. Accordingly, the matter is ripe for adjudication.

## II.  Authority

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

---

[3] With my permission, the parties also briefed their respective positions on an appropriate damages award in the potential event that Petitioner first prevailed on the disputed entitlement issues and consequently established a Table SIRVA claim. But as explained herein, Petitioner's Table SIRVA claim must be dismissed for failure to establish reduced range of motion.

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Hum. Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[4] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g., tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would

---

[4] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

3

not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10) (2017).

### III. Relevant Evidence

I have reviewed all submitted evidence including all medical records and affidavits, as well as the Petition, the Rule 4(c) Report, and both parties' briefing. The following section focuses on the evidence most relevant to the disputed issues: situs and range of motion.

- Upon receiving the subject vaccination, Petitioner was twenty-one (21) years old and in good health. *See generally* Exs. 3, 6. He lived at his mother's home in Massachusetts when not attending college in Connecticut (about 65 miles away). Ex. 1 at ¶¶ 1 – 2; Ex. 11 at ¶ 5. He was a college senior, majoring in nursing. Ex. 4 at 13; Ex. 7 at 3.

- Petitioner received the subject flu vaccine on October 1, 2020. Three contemporaneous records have been filed:

    o CVS's computerized medical record lists a vaccine administration site of "left deltoid." Ex. 5 at 2 (also appearing at Ex. 8 at 8).

4

- - CVS also retained a copy of the vaccine intake consent form. Regarding the vaccine administration site, a handwritten notation is unclear, possibly suggesting either an R or an L. Ex. 8 at 5.

  - Petitioner's own copy of the same consent form contains a clearer handwritten "R." Ex. 13 at 1.[5]

- Fourteen (14) days post-vaccination, on October 15, 2020, Petitioner presented to the Connecticut Orthopedics practice, where he first completed a medical history form. Ex. 4 at 15. He reported a right shoulder injury occurring "after influenza vaccine" and an onset of "10/01/2020." *Id.*

- That same day, Thomas P. Moran, M.D., conducted the initial evaluation – starting with Petitioner's identification as a nursing student, and his history of right shoulder pain beginning one day after his influenza vaccine. Ex. 4 at 13. Dr. Moran recorded: "[a]t the time of the injection, [Petitioner] felt that it was placed high in the arm near the subacromial space. He denies any loss of motion in the shoulder. It does not awaken him at night." *Id.* On physical examination, Petitioner had "full active and passive range of motion… positive impingement, no AC joint of bicipital groove tenderness. *Id.* X-rays were negative. *Id.* Dr. Moran's assessment was "subacromial bursitis, status post influenza vaccine [with] no evidence of adhesive capsulitis." *Id.* He prescribed the anti-inflammatory medication Meloxicam to take for the next 7 – 10 days. *Id.*

- At an October 26, 2020, orthopedics follow-up, Petitioner reported ongoing right shoulder pain and no relief from Meloxicam. Ex. 4 at 6. Physical examination found "full range of motion, there is no abduction weakness, negative Speed's and O'Brien's test." *Id.* Dr. Moran assessed "internal derangement," and recommended an MRI to "rule out any intraarticular pathology," but he "would not recommend any steroid injections given [Petitioner's] age." *Id.* at 6 – 7.

- On November 18, 2020, Dr. Moran entered a referral to "physical therapy/ occupational therapy" based on his assessment of right shoulder bursitis and internal derangement. Ex. 4 at 4. Dr. Moran's referral order identifies Star Physical Therapy – with seven locations throughout Connecticut – followed by the following language: "Evaluate and treat[.] Pain reduction[.] Strengthening[.] Improved ROM

---

[5] After situs was identified as a factual issue to be resolved, Petitioner swore under penalty of perjury: "I kept my consent form following the vaccination form following the vaccination [and…] provided it to my attorney." Ex. 10 at ¶ 2; *see also* 28 U.S.C.A. § 1746 (providing that a declaration sworn under penalty of perjury may be afforded "like force and effect" as an affidavit).

– AROM PROM[.] Treatment frequency: 2 – 3 times/ week[.] Treatment duration: 3 – 4 weeks[.] *Id.*

- On November 30, 2020, Petitioner had a telemedicine encounter with a nurse practitioner at his primary care practice located in South Hadley, Massachusetts, for a chief complaint of high blood pressure. Ex. 3 at 23. The nurse also recorded: "[Petitioner] went to get flu shot on 10/01 – injected into R shoulder[.] Has had bursitis since[.] Saw orthopedics – ordered MRI and PT[.] Was prescribed Meloxicam – helped a little[.] Pain was still constant but little improved[.] Decided not to get MRI, has not started PT bc of school[.]" *Id.* at 24. The nurse noted that in approximately two weeks, Petitioner's school semester would be over, he would be returning home to Massachusetts, and he "may need order for PT" for his right shoulder injury. *Id.*

- The next medical record is from several months later: March 15, 2021, at Pioneer Spine and Sports Physicians in West Springfield, Massachusetts. Ex. 7 at 3. A physician's assistant ("PA") recorded Petitioner's history of "receiv[ing] a flu shot in his right upper arm" followed by "significant pain throughout his right shoulder and deltoid region" and "difficulty raising his arm above shoulder level." *Id.* At present, Petitioner had "persistent pain at his shoulder… achiness and sharp pain. Mild achiness laying on his right shoulder at night." *Id.* He "ha[d] not done any physical therapy." *Id.*

- During the review of systems at this exam, Petitioner "denie[d] arthritis, stiffness, and swelling." Ex. 7 at 4. Physical examination found: "Full range of motion at bilateral shoulders, there is right shoulder pain with forward flexion and abduction in the impingement arc. Positive right impingement testing. Tenderness to palpation of the right supraspinatus and the posterior rotator cuff muscles… Strength is 5/5 throughout the right shoulder but some increased pain with resisted right supraspinatus testing and external rotation." *Id.* at 5. The PA's assessment was rotator cuff irritability and tendinitis with impingement syndrome. *Id.* Because Petitioner "ha[d] limited time given his current schedule to pursue physical therapy[,] would like to proceed with injection management." *Id.* Accordingly, he received a right subacromial corticosteroid injection. *Id.* The PA noted: "if symptoms persist[,] additional treatment option would be to order physical therapy." *Id.*

- At a June 2, 2021, follow-up with the sports medicine PA, Petitioner reported that his right shoulder pain had improved by about 90% after receiving the steroid injection. Ex. 9 at 3. "[Petitioner] is now graduated from nursing school and has

6

some time do some physical therapy for his residual symptoms and would like us to write this order. He feels some very mild discomfort at his right shoulder with activities above shoulder level, otherwise he is doing well." *Id.* On exam, Petitioner again had "full range of motion at bilateral shoulders," with the changes of mild discomfort with forward flexion and abduction, and a negative impingement sign. Id. at 4. The PA assessed that Petitioner had "very mild residual right shoulder pain consistent with rotator cuff irritability," for which he should "do a short course of physical therapy to focus on a home exercise program," after which no additional treatment should be needed. Id. at 5.

- At a September 27, 2021, follow-up with the sports medicine PA, Petitioner reported "gradually returning pain and achiness at his right shoulder" particularly when reaching overhead, assisting patients, and laying on the shoulder at night. Ex. 12 at 2. Petitioner reported "minimal improvement" with meloxicam. Id. He had "done physical therapy exercises in the past and also tried taping his shoulder but his symptoms are persisting." Id. On exam, Petitioner again had "full range of motion at bilateral shoulders," with the changes of pain with forward flexion and abduction, and a *positive* impingement sign. *Id.* at 3. The PA's assessment was rotator cuff tendinitis impingement syndrome, for which he administered a second steroid injection. *Id.* The PA added that "physical therapy was minimally helpful [in] the past," and that if the repeat injection was not helpful, Petitioner could consider an orthopedic surgery consultation. *Id.*

- Petitioner has not filed any medical records beyond September 27, 2021, any records of any formal physical therapy, occupational therapy, or any other contemporaneous documentation relevant to the disputed issues.

- On December 26, 2020, Petitioner declared under penalty of perjury that he received the subject vaccine in his right shoulder on October 1, 2020, at his university's health fair, which was run by the local CVS. Ex. 1 at ¶ 2. Petitioner recalled developed right shoulder pain within 48 hours, and ongoing, unspecified "right shoulder injuries." *Id.* at ¶¶ 3 – 4.

- On December 16, 2021, Petitioner, again under penalty of perjury, recognized that CVS's copy of the vaccine administration record suggested a left-sided situs. Ex. 10 at ¶ 1. But Petitioner had kept his "consent form" from the subject vaccination, and provided that to his attorney. *Id.* at ¶ 2. Petitioner maintained, regardless of the records, that his recollection of a right-sided administration was correct: he "felt pain right away after vaccination and related [his] pain to the vaccination immediately." *Id.* at ¶ 3.

7

- On January 16, 2022, Petitioner's mother, also under penalty of perjury, stated that she was an occupational therapist with experience primarily treating shoulder and arm injuries. Ex. 11 at ¶ 2. She recalls Petitioner's complaints of a vaccine administered "too high" in his right shoulder, beginning in a phone call that same day. *Id.* at ¶ 3. Due to the pain, Petitioner had to drive left-handed. *Id.* at ¶ 4.

- Petitioner's mother further recalled: "[a]pproximately once per month, [Petitioner] would come home to work a few shifts at the hospital. When he came home for the first time after his vaccination, I examined his shoulder and performed soft tissue mobility work with him, as well as assisted range of motion exercises. I taught him some stretches, and recommended heat before stretching then ice after. Then he went back to school." Ex. 11 at ¶ 5. "The next time I knew he was coming home, I borrowed the ultrasound machine from the office. When he came home, I did kinesio tape and ultrasound treatments with him." *Id.* at ¶ 6. "The last time I treated him was after the second cortisone shot in the fall of 2021." *Id.* at ¶ 7.

## IV.   Findings of Fact

### A.   Situs

Respondent disputes whether Petitioner had presented preponderant evidence of his right-sided situs allegation, in the face of the "conflicting" vaccine administration records. Rule 4(c) Report at 5 – 6. Respondent states that CVS's copy of the consent form "is not high-resolution enough to determine if the person who administered the vaccine intended to write an 'R' or 'L.'" Rule 4(c) Report at n. 1.

Thus, Respondent's objection centers primarily on the discrepancy between CVS's *computerized* record indicating "left deltoid," and Petitioner's own copy of the consent form, which indicates a clearer handwritten R. But as repeatedly observed in Program cases, "it is not unusual for the information regarding site of vaccination in computerized systems to be incorrect." *See, e.g., Patterson v. Sec'y of Health & Hum. Servs.*, No. 20-1919V, 2023 WL 7220783, at *5 (Fed. Cl. Spec. Mstr. Oct. 2, 2023) (internal citations omitted). Thus, the computerized form is not entitled to a higher presumption of accuracy *per se*.

Respondent suggests that Petitioner's copy of the consent form was "created later since it is the same [as CVS's copy of the consent form] but with different handwriting." Rule 4(c) Report at n. 1 (comparing Ex. 8 at 5 – 6 and Ex. 13 at 1-2). Respondent does not emphasize any particular handwriting differences, however. I can discern a slight difference in the immunizer's signature on the two forms. Such a difference might be

explained by the poor quality of the fax from CVS, or by the immunizer completing two copies of the form. But there is no evidence that Petitioner's copy was created later, or is otherwise inauthentic, particularly because his copy has the vaccine vial's sticker affixed to it – corroborating its reliability. *See* Scheduling Order (ECF No. 38) at 2. Petitioner has also produced this copy of the consent form under penalty of perjury. *Id.* (citing Ex. 10). And the medical records beginning two weeks post-vaccination consistently document Petitioner's history of a right-sided vaccination, which in his opinion, caused his right-sided injury. *Id.*[6] Petitioner maintains these points in his Brief (ECF No. 39), and Respondent has not presented any further analysis. *Compare* Rule 4(c) Report (ECF No. 36) at n. 1 and 5 – 6; Response at n. 1 and 5 - 6 (ECF No. 41). Overall, I find that there is preponderant evidence of a right-sided vaccine administration, consistent with Petitioner's allegation.

### B. Reduced Range of Motion

Respondent's second objection is that Petitioner "never demonstrated reduced range of motion in his right shoulder… Thus, the evidence fails to establish that Petitioner suffered a presumptive Table SIRVA injury." Rule 4(c) Report (ECF No. 36) at 6.

On this point, I previously noted that "[w]hile it is not certain that the Table definitely requires such a [decreased range of motion] finding (and/or in a particular timeframe), Mr. Schoenborn *may* be able to establish that he suffered mild limitations that were managed conservatively, including through early informal treatment by his mother, a physical therapist. Again, he may take the opportunity to fil any available contemporaneous evidence that corroborates the informal treatment program (or identify citations to it within the existing medical records, in his briefing." Scheduling Order (ECF No. 38) at 2.

Petitioner did not file any further evidence, however. He otherwise contends that it is "unsettled law" whether a Table SIRVA injury requires limited range of motion. Brief (ECF No. 39) at 7. Petitioner argues that if such a requirement exists, "[w]here *painful* range of motion ends and *limited* range of motion begins is up for debate. In many cases, providers seem to treat them as one in the same, i.e., providers noting range of motion *limited by pain*…" *Id.* In Petitioner's specific case, he emphasizes the medical providers' documentation of *painful* motion and impingement signs. Brief at 7. Respondent did not

---

[6] Although these entries were based upon information provided by Petitioner, they still should be afforded greater weight than more current representations, as they were uttered contemporaneously with Petitioner's injury for the purposes of obtaining medical care. The Federal Circuit has stated that "[m]edical records, in general, warrant consideration as trustworthy evidence . . . [as they] contain information supplied <u>to</u> or by health professionals to facilitate diagnosis and treatment of medical conditions." *Cucuras*, 993 F.2d at 1528 (emphasis added). Thus, the Circuit has instructed that greater weight should be accorded to this information even when it is provided by Petitioner.

provide any further analysis. *Compare* Rule 4(c) Report (ECF No. 36) at 6; Response at 6 (ECF No. 41).

Shortly after receiving both parties' briefing here, I concluded in a different case that based on a review of 42 C.F.R. § 100.3(c)(10), "the QAI definition for a SIRVA injury requires that a Petitioner demonstrate they suffered *both* pain and limited or reduced range of motion following receipt of a covered vaccine." *Bolick v. Sec'y of Health & Hum. Servs.*, No. 20-0893V, 2023 WL 8187307, at *8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023) (emphasis added). Although I noted therein that the Table "makes no reference to range of motion occurring within a specified time-frame," (*Bolick,* 2023 WL 8187307, at *7), I did not determine or propose what kind of range of motion deficiencies are sufficient under the Table. But (after examining medical records documenting a shoulder injury for over six months post-vaccination, additional evidence, and briefing from both parties), I did find in *Bolick* that pain *on movement* of the shoulder is "not equivalent to a limitation on movement *entirely*." *Id.* at *9 (emphasis added).

The same conclusion is mandated in Mr. Schoenborn's case. As reviewed above, 14 days post-vaccination, he "denie[d] any loss of motion in the shoulder," and the orthopedist's physical exam found "full" range of motion. Ex. 4 at 13. Eleven (11) days later, the orthopedist reiterated that range of motion was "normal." Ex. 4 at 6. And there is no other record evidence of subsequent movement limitations, distinguishable from experiencing pain simply when the shoulder moved. The Table requires more.

While not argued by Petitioner, I have also considered that the orthopedist authorized PT and/or OT – listing "Improved ROM – AROM PROM[.]" among the potential indications or objectives for the treatment. Ex. 4 at 4. However, there are no records evidencing that the orthopedist had actually reevaluated Petitioner, or otherwise changed his previous finding that range of motion was normal. The orthopedist's recommendation, as well as the mother's provision of "assisted range of motion exercises" beginning in or about November 2020, *see* Ex. 11 at ¶ 5, could have been merely to *prevent* losses to range of motion.

Petitioner's mother apparently treated his shoulder approximately once per month, from November 2020 until sometime in the fall of 2021, outside of a formal patient-provider setting – and no contemporaneous documentation of this treatment has been filed. Otherwise, the available medical records are very sparse, but are consistent in describing persistent right shoulder pain and impingement, but *full* range of motion. This specific information contained within the medical records is not defeated by the lack of more specific documentation (e.g., exact degrees of motion). And Petitioner's subjective

10

complaints that the pain was worse with movement, *see, e.g.*, Ex. 4 at 15, merely reflects that the pain was a "deterrent" as seen in *Bolick*, 2023 WL 8187307, at *9.

At bottom, there are certain core elements of a Table SIRVA, like pain within 48 hours, that must be satisfied in the claim is viable. Range of motion limits need not be shown to have begun immediately, or even in any specific time frame when compared to pain – but they must be demonstrated, and they are not the same as a reluctance to move the shoulder *due* to pain. Where this element cannot be satisfied, a Table claim is not viable.

## Conclusion

Petitioner has not established preponderant evidence that he suffered reduced range of motion, as required for a Table SIRVA. Accordingly, his Table SIRVA claim is dismissed.

As of yet, Petitioner has not alleged an "off-Table" causation-in-fact claim, or retained a medical expert (appropriately so, given that experts are not routinely authorized within the SPU context). But there appears to be sufficient evidence of right shoulder pain persisting for at least six months post-vaccination – thereby fulfilling the Act's statutory severity requirement; a very conservative treatment course and limited damages; and no apparent alternative cause.

It is thus conceivable a non-Table claim could be successful – but since this matter has been pending in SPU for some time with no success, I am unwilling to allow it to remain here indefinitely. Therefore, before the case is transferred out of SPU for further proceedings, the parties should promptly determine whether a tentative settlement agreement can be reached.

**Accordingly, by no later than Friday, March 29, 2024, Respondent shall advise, by either status report or email informal communication, whether the parties have reached a tentative settlement agreement of the case.** If Respondent cannot make that representation, the case will be transferred out of SPU pursuant to Vaccine Rule 3(d) – at which point the parties shall be prepared to promptly discuss potential next steps with the next special master assigned to the case.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
